```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION

In Re Enron Corporation         §
Securities, Derivative &        §        MDL-1446
"ERISA Litigation               §
                                §
_____§
MARK NEWBY, ET AL.,             §
                                §
          Plaintiffs            §
                                §
VS.                             §   CIVIL ACTION NO. H-01-3624
                                §        CONSOLIDATED CASES
ENRON CORPORATION, ET AL.,      §
                                §
          Defendants            §
CONNECTICUT RESOURCES RECOVERY  §
AUTHORITY,                      §
                                §
          Plaintiff,            §
                                §
VS.                             §   CIVIL ACTION NO. H-03-1558
                                §
KENNETH L. LAY, ET AL.,         §
                                §
          Defendants.           §
```

## OPINION AND ORDER

Pending before the Court in H-03-1558 is the Connecticut Resources Recovery Authority's ("CRRA's") notice (instrument #514), informing the Court that the parties' negotiations are completed and that the agreed stay on briefing relating to CRRA's pending motion for partial summary judgment should be lifted and the litigation should go forward. Accordingly, the Court lifts the stay and examines the pending motions.

On January 9, 2007,[1] before the stay was imposed, CIBC Defendants[2] filed a motion for a comprehensive scheduling order (#491). The briefing reflects that the parties disagree whether the Court should address CRRA's pending motion for leave to amend its complaint (#452)[3] and/or schedule the filing of [additional]

---

[1] This suit was brought pursuant to Connecticut General Statutes § 22a-268c ("the Attorney General shall have supervision over all legal matters and claims of (CRRA) arising from (the Enron) transaction") by Richard Blumenthal, Attorney General of the State of Connecticut, on behalf of CRRA, a Connecticut State agency created and controlled by statute, which manages, recycles, and disposes of solid waste for most of Connecticut's towns. It seeks to recover public money lost or damages for injury allegedly suffered by CRRA when Enron and its subsidiary, Enron Power Marketing, Inc., stopped payments to CRRA in breach of an agreement known as the "Enron Transaction" and filed for chapter 11 bankruptcy protection on December 2, 2001.

Specifically CRRA collects trash from its member towns, burns it, and sells the resulting energy. In 1985 CRRA entered into a long-term agreement with Connecticut Light and Power ("CL&P") under which CRRA would sell CL&P steam generated from such activities. In 2001 and 2002 CRRA restructured the energy-purchase agreement purportedly to substitute Enron Power Marketing for CL&P. Under the agreement CRRA pre-paid Enron a lump sum of $220 million, to be repaid with interest on a monthly basis from April 2001 until May 31, 2012, but no steam or electricity was ever exchanged. CRRA claims that what was disguised as a sale of energy to Enron was actually an unsecured loan that was illegal and *ultra vires* (beyond CRRA's statutory authority) to allow Enron to report a fake large cash infusion. After making eight payments, Enron defaulted and filed for bankruptcy. For more detailed discussion of the facts, see instrument #340.

[2] The CIBC Defendants are the Canadian Bank of Commerce, CIBC Inc., CIBC World Markets Corp., and CIBC Capital Corp.

[3] CRRA's motion seeks to (1) delete allegations and claims against parties that have been dismissed from the suit; (2) expand the factual allegations against the Citigroup Defendants for the aiding and abetting fraudulent and negligent misrepresentation counts in the Second Amended Complaint; and (3) add additional counts against the Citigroup Defendants arising out of direct misrepresentations made to CRRA during the course of the Citigroup Defendants' performance as underwriter for CRRA.

motions to dismiss (with deadlines for responses and replies) and resolve those potential motions before setting deadlines for response and replies to the already pending motion for partial summary judgment (#481) against the CIBC Defendants.

Because initially resolving the motion for leave to amend will clarify which is the controlling complaint, the Court addresses it now. In addition, since the only objections to the motion for leave to amend were filed by two credit rating agencies, Moody's Investors Services, Inc. ("Moody's") and Standard & Poor's Credit Marketing Services ("S&P"), the Court first examines CRRA's motion for reconsideration (#353)[4] of the

---

The Citigroup Defendants have not objected to the motion for leave to amend.

[4] The motion for reconsideration was filed four months after the order of dismissal and thus is reviewed under Fed. R. Civ. P. 60(b). *Lavespeare v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1990)(Although the Federal Rules of Civil Procedure do not recognize a "motion for reconsideration in *haec verba*," if a motion to reconsider is filed more than ten days after entry of judgment, it falls under Rule 60(b)), *cert. denied*, 510 U.S. 1993), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). Under the relevant part of Rule 60(b), "the court may relieve a party . . . from final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." The "mistake" can be the court's error." *Oliver v. Home Indemnity Co.*, 470 F.2d 329, 330 (5th Cir. 1972), *citing Meadows v. Cohen*, 409 F.2d 750, 752 n.4 (5th Cir. 1969)("It is the view of this Court that under the present rule, a court is authorized under subsection (1)

Court's opinion and order of February 16, 2005 (#340), dismissing CRRA's claims against Moody's and S&P, as well as Fitch, Inc. Moody's and S&P object to the motion for leave to amend (#461 and #458, respectively) on the grounds that the proposed third amended complaint (#452) merely repeats claims against them that the Court dismissed in #340. The two credit rating agencies were sued under Connecticut common law of negligent misrepresentation and for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes § 42-110a, *et seq.*, in an alleged scheme with other Defendants to misstate or conceal material information about Enron's financial condition.

In the February 16, 2005 opinion dismissing the claims[5] against three credit rating agencies, the Court denied CRRA an opportunity to replead on the grounds that the absence of a duty of care as a matter of law made amendment of the negligence claim futile. In its motion for reconsideration, CRRA now argues that

---

to correct a substantive 'mistake' of its own if motion is made within a reasonable time, which would clearly encompass a time not exceeding the time allowed for appeal."). This Court notes that CRRA has waited far longer than the thirty-day appeal period to raise judicial error in the earlier opinion. The decision to grant or deny relief lies within the sound discretion of the court and will be reversed only for abuse of that discretion. *Santa Fe Snyder Corp. v. Norton*, 385 F.3d 884, 887 (5th Cir. 2004).

[5] CRRA does not appear to seek reconsideration of the Court's dismissal of the CUTPA cause of action against Moody's and S&P because it has not addressed the basis for that dismissal in its motion. CRRA expressly states that it does not seek reconsideration of dismissal of either of the two claims against Fitch, Inc. ("Fitch"), with which CRRA concedes that it did not have a contractual relationship.

CRRA had a direct, contractual relationship with Moody's and S&P that imposed a duty of care on both agencies to CRRA and that was materially distinct from CRRA's relationship with Fitch, i.e., as a third-party consumer of the credit rating agencies' evaluations of Enron debt and securities, or a "reader-publisher."  CRRA claims that it contracted with and paid Moody's and S&P to rate bonds that CRRA was issuing (and not, as the Court assumed in its opinion, bonds that Enron was issuing and that CRRA was purchasing) and that as part of that process, to evaluate CRRA's transaction with Enron before CRRA entered into it.  CRRA claims that it "comprehensively informed" Moody's and S&P of the details of CRRA's proposed transaction with Enron more than three months before closing the deal, and that Moody's and S&P gave opinions directly and only to CRRA about the effect the transaction would have on CRRA's financial stability,[6] in addition to its ongoing

---

[6] The Court observes that the Second Amended Complaint and Third Amended Complaint spend substantial time and space addressing Moody's and S&P's credit ratings of Enron and Enron's bonds generally, and only minimally summarize the obligations of the parties under the proposed Enron Transaction.  Moreover they essentially say nothing about the credit agencies' predictions about the impact of that transaction on CRRA's financial stability and on bonds issued by CRRA.  Furthermore, the only occurrence of the word "duty" is in the conclusory statement in ¶ 449: "Despite their position in the investment market, and their duty to CRRA and similarly situated persons contemplating a $220 million loan to Enron, the Agencies negligently published false and misleading credit information concerning Enron when they had information available to them, and when they could have and should have requested information directly from Enron that would have showed Enron's financial situation was precarious and not what Enron had been representing it to be."  Neither pleading provides specific, individual, personal facts or circumstances, relating to contracts with Moody's and S&P for the agencies to evaluate the issuance of

and publicly distributed evaluation of Enron's creditworthiness generally.[7] Moreover, CRRA point out that, by statute, it is not permitted to make investments rated below "investment grade" by the credit rating agencies and emphasizes that it was therefore by law required to rely on such credit ratings. #452 at ¶ 471, citing Conn. Gen. Stat. § 22a-265(14), 3GA-275(b). CRRA requests the court to reconsider its dismissal of the negligent misrepresentation claims against Moody's and S&P and to permit it to amend its complaint to allege heightened scienter.

---

CRRA's bonds in 2000 or the Enron Transaction, that would give rise to a duty of care owed specially to CRRA. CRRA's complaint instead addresses only the rating agencies' overall assessment of Enron's financial health, obviously intended for the investing public at large. *See, e.g.,* ¶ 452 ("The combination of the Agencies' access to information from the issuers, its experienced staff, the financial disclosure regime in the United States, put the Agencies in a special position in relationship to investors who rely on their rates, and reasonably should have enabled the Agencies to avoid making this misrepresentation of Enron's creditworthiness."); ¶ 457 ("At the time of the Enron Transaction, the Agencies claimed that their credit ratings of Enron in the investment grade category were supported by meetings and other reviews, and were calculated and monitored on an ongoing basis through analysis of, among other materials, Enron's reported and audited financial statements including, in particular, its cash flow, debt burden, and other key financial metrics relative to Enron's creditworthiness.").

[7] CRRA quotes the following part of the Court's order (#340 at 169):

> Here, the Court finds the relationship between the alleged negligent misrepresentation by the Credit Rating Agencies and the harm to CRRA too remote, as a matter of public policy, to impose a duty. The credit reports were distributed to the world at large. At most, the Credit Rating Agencies were rating Enron's creditworthiness for payment of specific bonds issued during 2000. CRRA did not purchase these bonds.

Because the underlying motion was for dismissal under Rule 12(b)(6),[8] the Court has examined the proposed Third Amended Complaint (#452), even though CRRA has had three bites of the apple already, to determine if CRRA has stated a claim for which relief might be granted. After reviewing the then governing Second Amended Complaint (#306), the proposed Third Amended Complaint (#452), and the briefing, the Court concludes for the following reasons that the motion for reconsideration should be denied.

The Supreme Court of Connecticut has adopted § 552 of the Restatement (Second) of Torts (1977) for negligent misrepresentation:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or

---

[8] Dismissal under Rule 12(b)(6) is disfavored and a motion to dismiss under the rule is rarely granted. *Lowrey v. Texas A&M University System*, 117 F.3d 242, 247 (5th Cir. 1997). The court must construe the complaint liberally in favor of the plaintiff and all well pleaded facts must be taken as true and any doubts regarding the sufficiency of the claim must be resolved in favor of the plaintiff. *Id.; Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003). Nevertheless conclusory allegations and unwarranted factual deductions will not suffice to avoid a motion to dismiss. *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). Dismissal is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lowrey,* 117 F.3d at 247, *citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

>competence in obtaining or communicating the information.
>
>(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>>(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>(b) through reliance upon it in a transaction he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
>(3) The liability of one who is under a public duty to give information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217-18, 520 A.2d 217 (1987); *Williams Ford, Inc.*, 232 Conn. 559, 576, 657 A.2d 212 (1995). Thus for a cause of action for negligent misrepresentation, a plaintiff must prove that (1) the defendant made a misrepresentation and (2) the plaintiff reasonably relied upon that misrepresentation. "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Williams Ford*, 232 Conn. at 574. Whether the evidence supports a claim for negligent misrepresentation and whether the plaintiff reasonably relied on such misrepresentation are questions of fact for the trier of fact. *Jaser v. Fischer*,

65 Conn. App. 349, 358, 783 A.2d 28 (2001); *Williams Ford*, 232 Conn. at 580.

Nevertheless, the existence of and breach of a duty owed to the plaintiff are essential elements for a finding of negligence. *Catz v. Rubenstein*, 201 Conn. 39, 44, 513 A.2d 98 (1986). The determination of whether there is a duty of care is a matter of law for the court to decide; only if the court finds such a duty exists does the trier of fact then determine whether it was breached in the case before it. *Gazzo v. Stamford*, 255 Conn. 245, 250, 765 A.2d 505 (2001); *Murillo v. Seymour Ambulance Assoc.*, 264 Conn. 474, 479, 823 A.2d 1202 (2003). "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what . . . [that person] . . . knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 372, 441 A.2d 620 (1982). "Duty is a legal conclusion about relationships between individuals made after the fact . . . . The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." *R.K. Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 385-86, 650 A.2d 153 (1994).

Connecticut courts apply a two-prong test to determine whether a legal duty of care exists: "(1) . . . whether an ordinary person in the defendant's position, knowing what the

defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) . . . on the basis of a public policy analysis, . . . whether the defendant's responsibility for his negligent conduct should extend to the particular consequences or particular plaintiff in the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." *Gazo*, 255 Conn. at 250, *citing Mendillo v. Board of Education*, 246 Conn. 456, 483-84, 717 A.2d 1177 (1998). Thus it is insufficient to find a duty of care based only on foreseeable harm; the court must also find that as a matter of public policy the defendant should be held responsible for its negligent conduct for the harm it caused the particular plaintiff in the case. *Mendillo*, 246 Conn. at 483-84.

Was it reasonably foreseeable that CRRA might rightfully and detrimentally rely on Moody's and S&P's evaluation of CRRA's transaction with Enron and of the financial status of Enron in deciding whether to provide a $220 million loan to Enron, i.e., would an ordinary person in the defendant's position, knowing what the defendant knew or should have known, have anticipated harm of the general nature of that suffered was likely to result? Although CRRA claims that its contracts with the two agencies gave rise to a particular duty of care, it fails to provide any details of its agreement with S&P and Moody's and only a bare-bones list of the transactions comprising the Enron Transaction. It claims

it gave "comprehensive" information to the credit rating agencies, but fails to specify what.  Instead of focusing on the Enron Transaction or providing facts about Moody's and S&P's evaluation of it's effect on CRRA, the complaint conclusorily points to other alleged fraudulent business practices, entities, deals, and accounting of Enron that are not specifically related to CRRA's 2000 bond issue[9] or to the Enron Transaction.  It fails to demonstrate why or how a credit rating agency, no less an ordinary person, would have known or should have known of the "misrepresentation" of Enron's creditworthiness. *See, e.g.,* #452 at ¶¶ 459 a-o, 460.  CRRA's minimal identification of the series of transactions or obligations (#452 at ¶¶ 467-70, especially 467) that were to constitute the Enron Transaction on their face are not fraudulent or misleading, and CRRA provides no explanation why they might be.[10]  Stripped down to its essence, CRRA's complaint

---

[9] Indeed Moody's and S&P point out and provide supporting evidence to show that the 2000 CRRA bonds were not even related to Enron, but were issued for the purpose of raising funds for the construction of a "maneuvering hall" for CRRA's garbage trucks and an "air-processing system" to control its solid waste facilities. #358 at 8 & Ex. A.

[10] The Third Amended Complaint at ¶ 467 states in relevant part, in essence reciting the terms of the agreement,

> CRRA informed these Agencies that pursuant to a proposed series of transactions:
> a.  CL&P would assign to Enron and Enron would assume the obligations of CL&P under the Energy Purchase Agreement.  CL&P would make a lump sum payment to Enron in an amount equal to the above-market portion of the price CL&P is required to pay for steam for the duration of the Energy Purchase Agreement.

against Moody's and S&P is that it relied on the credit agencies'

---

> b.  CRRA and Enron would simultaneously amend the Energy Purchase agreement to provide for the sale by CRRA of steam to Enron in an amount sufficient to generate 250 million kilowatt hours of electricity in each year. Enron would pay CRRA a "capacity charge" equal to $2.2 million per month.
> c.  Enron would enter into an Electric Generation Agreement with CRRA under which Enron would pay CRRA to convert the steam sold to Enron into 250 million kWh of electricity per year at prices starting at $.030 per kWh in the calendar year 2001 and increasing $.001 per year up to $.033 per kWh for the calendar year 2004 and each calendar year thereafter through the remainder of the term of the agreement in 2012.

Paragraph 468 provides in part, "Although the information provided concerning the Enron Transaction indicated that Enron was, in essence, to receive a loan in the form of a 'lump sum" to be repaid on a monthly basis (Enron itself never would generate or distribute steam or electricity,), Moody's and S&P raised no concerns over this transaction."  The complaint does not state how Moody's and S&P should have known that Enron would not generate any steam or electricity.  It further vaguely complains that "even though CRRA informed these Agencies that in entering into the Enron Transaction, CRRA was motivated by and relying on Enron's higher credit ratings compared to CL&P, Moody's and S&P did not engage in any reasonable review of Enron's financial statements or use their multiple avenues of access to obtain further information concerning this specific transaction or whether it was symptomatic of Enron's business strategy and accounting practices."  *Id.* at ¶ 468.  The complaint conclusorily continues, "Rather, with knowledge of the nature of the proposed transaction, Moody's and S&P gave favorable ratings to the bonds issued by CRRA, A2 and A, respectively."  *Id.* at ¶ 469.  In the only specific  "misrepresentation" identified in the complaint, by Moody's on December 1, 2000, the terms of the new Energy Purchase Agreement are again recited and the complaint states, "Moody's views as a credit positive the $26.4 million 'floor' in the annual payments that is a result of the capacity payments.  We also note that at lower than historic generation levels, the facility's electric revenues are higher than they would have been under the CL&P complaint."  *Id.* at ¶ 469.  There is no explanation of how this constitutes a misrepresentation, but only contends that "S&P and Moody's gave Enron investment grade credit ratings that were undeserved and were more favorable than the credit rating of CL&P."

favorable ratings of Enron's creditworthiness generally when it made an unsecured, lump sum, up-front loan to Enron, which Enron was to repay with interest over a period of years, and then Enron defaulted and filed for bankruptcy after only a few months. That CRRA's execution of such an agreement was purportedly illegal and *ultra vires* is not Moody's or S&P's fault.

Even if the contracts with the rating agencies did give rise to a duty of care and the agencies' alleged failure to investigate, at least as one fact, made the injury to CRRA from the defaulted loan foreseeable, CRRA fails to satisfy the second, public-policy prong of the test. Do public policy reasons support holding the credit rating agencies responsible for their alleged negligent representations in this case? The Court's previous opinion discussed at length the recognized public policy reasons for not imposing liability on credit rating agencies for negligent evaluations of companies' financial conditions. The mere foreseeability of possible financial loss in any risky transaction, by itself, would impose unlimited liability on them. Rating creditworthiness, even without proof of negligence, is not an exact science. More to the point, credit agencies play a major role in the efficient operation of a capital market, which would be chilled by unrestricted liability. Credit rating agencies' gathering of information about issuers and securities, their expertise in evaluation and independent analysis of that information about matters of public concern, and their

dissemination of it to the public, without any personal interest on their part, constitute an invaluable service to the economy and to investors and lenders as a whole.  Allowing anyone who had read credit rating reports, claimed he relied on them, and lost money, to sue the credit rating agencies, not because they knowingly or with actual malice disseminated false information about Enron, but because they negligently published false and misleading information when true information allegedly was available and they could and should have uncovered and reported it, would be far more deleterious than beneficial to society as a whole.  Imposing such liability would open the floodgates of litigation against credit rating agencies by disappointed investors and creditors and chill the agencies from vital and vigorous participation in the ratings process and the market place, where the free flow of information and conflicting views ideally establish reliability.  Moreover the credit reports at issue had clear, unambiguous disclaimers that they were opinions, not guarantees.  Furthermore CRRA was a sophisticated business entity with substantial business acumen that should have known the risks of unsecured loans and the uncertainty of the marketplace.  Thus the Court concludes that public policy would not support imposing liability on Moody's and S&P for CRRA's loss for their purported negligent evaluation of Enron's creditworthiness with respect to the Enron Transaction.

Therefore, the Court sustains Moody's and S&P's objections to CRRA's motion for leave to amend.  While the Court

will allow CRRA to amend its complaint, it denies the motion for reconsideration and strikes the claims against Moody's and S&P from the Third Amended Complaint.

The Court therefore turns to CIBC's request that the Court establish a schedule for motions to dismiss to be filed within forty-five days and defer ruling on the pending motion for partial summary judgment until after it rules on the as yet unfiled motions to dismiss.  CRRA objects that the allegations against the CIBC Defendants have remained the same since December 22, 2003 in CRRA's First, Second, and now proposed Third Amended Complaint.  CRRA points out that several Defendants have filed motions to dismiss and the Court has ruled on them, but that the CIBC Defendants did not seek to dismiss the claims against them until after CRRA filed the motion for partial summary judgment.  Moreover, discovery is now closed.

The Court agrees with CRRA that there is no reason to delay proceeding with the motion for partial summary judgment and

ORDERS that CIBC's motion for a comprehensive scheduling order (#491) is DENIED.  Instead the Court will review the pending motion for partial summary judgment according to the following briefing schedule:  responses are due within 30 days of entry of this opinion and order; replies shall be filed within 20 days after the filing of the responses.  If appropriate and if Defendants wish, they may also file motions to dismiss, which the Court will consider when ripe.

Accordingly, for the reasons indicated above, the Court

ORDERS that the stay on briefing the motion for partial summary judgment is LIFTED.  The Court further

ORDERS that CRRA'S motion for reconsideration (#353) is DENIED, but its motion for leave to amend (#452), except for the inclusion of claims against Moody's and S&P, is GRANTED.  CIBC's motion for a comprehensive scheduling order (#491) is DENIED; the briefing schedule for the pending motion for partial summary judgment described above is now in effect.

**SIGNED** at Houston, Texas, this 5th day of June, 2007.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE